FERRELL, APPELLANT, *v.* EVANS ET AL., RESPONDENTS.

(No. 1,330.)

(Submitted April 19, 1901. Decided July 15, 1901.)

*Building and Loan Associations—Expiration of Charter—Unmatured Stock—Borrower—Application of Bonus—Credit for Stock—Receiver.*

1.  Where, the charter of a building and loan company having expired, the directors, as trustees in winding up its affairs, collected from a borrower interest and dues on shares of stock, on foreclosure of his mortgage the sums so collected should be credited on the mortgage debt.

2.  Plaintiff, a stockholder in a building and loan association, borrowed therefrom, giving a bonus. Before the stock matured the charter expired. *Held*, that plaintiff should be credited with so much of the bonus as was unearned, computed by dividing the amount of bonus by the number of months which would be required to mature the stock, and multiplying the quotient by the number of months still to elapse before such maturity.

3.  When the charter of a building and loan association expired before its stock matured, a borrower should be credited with the accrued value of his shares of stock and the unearned portion of his bonus, computed to the time the charter expired, less his share of expenses of administering the affairs of the association.

4.  Under Civil Code, Sec. 561, constituting the directors of a corporation dissolved for any reason trustees to wind up its affairs, when the directors of a building and loan association, whose charter has expired, are acting as such trustees, a receiver should not be appointed unless it appears that the party complaining has been, or is about to be, injured by unwarranted procedure on the part of such trustees.

*Appeal from District Court, Missoula County; Frank H. Woody, Judge.*

ACTION by Van R. Ferrell against J. M. Evans and others. From a judgment for defendants and an order denying a new trial, plaintiff appeals. Reversed.

## STATEMENT OF THE CASE.

The plaintiff brought this action against the defendants, as trustees of the Missoula Building & Loan Association, a corporation, to obtain a judgment requiring them to cancel upon the records of Missoula county as fully paid three several mortgages executed to the corporation by one Cain B. Mahoney, plaintiff's grantor. Judgment is also demanded for a balance which is alleged to have been paid by plaintiff and Mahoney in excess of the amounts secured by the mortgages. As incidental relief, the court is asked to appoint a receiver to take charge of the assets of the corporation and wind up its business. The answer of defendants denies the material allegations contained in the complaint, and then, by way of separate counterclaims, alleges a breach of the conditions of each of the mortgages, and demands a decree of foreclosure to enforce the payment of the respective amounts secured by them.

The facts, as they appear from the evidence, are: On May 6, 1886, the Missoula Building & Loan Association was incorporated under the provisions of an act of the legislative assembly of the territory of Montana approved March 7, 1883, for the purpose of enabling its shareholders to erect buildings and improve land. The corporation conducted its business successfully and profitably until May 6, 1896, the date on which the ten-years limitation fixed in its charter expired, and the corporation was dissolved, whereupon the defendants, its then acting directors, under the authority vested in them by law, assumed control of all the property and assets belonging to it, and proceeded to wind up its affairs. At various times after its organization the corporation had issued five different series of shares of the par value of $200 each, designated as Series A, B, C, D and E. Of these the first two series had matured prior to

May 6, 1896, and were then in process of redemption. The remaining three series had been issued on June 4, 1888, November 3, 1890, and June 8, 1895, respectively; and it was estimated by the directors at the time they assumed control, the estimate being based upon the time required to mature Series A and B, that each of these series would have matured in 101 months from the dates of issuance, or in 6 and 35 months, respectively, after the date of dissolution. Upon the assumption of their duties as trustees, the directors were of the opinion that they were empowered to continue the collection of dues, fines, premiums and interest until the maturity of the outstanding shares, and proceeded to do so. Subsequently, however, they changed their views, and on August 22, 1896, issued a circular to the shareholders, in which they set forth in detail the condition of affairs, and announced that thereafter no dues or fines would be collected from nonborrowing shareholders, and that upon application all payments made by such shareholders after May 6, 1896, would be refunded, but that borrowing shareholders would be required to keep up their monthly payments as theretofore until the maturity of their shares. It was also stated that on May 6, 1896, the shares of Series C had an earned value of $182.82, of Series D, $113.42, and of Series E, $23.62, and that, as fast as the assets could be turned into money, payments would be made to nonborrowing shareholders until they had received full earned value of their shares fixed at these amounts. Thereafter they proceeded upon this idea of the extent of their powers, collecting dues and fines from the borrowing shareholders, until their regular monthly meeting in December, 1896, when, by resolution, they declared all shares of Series C fully matured, and thereupon executed releases of all mortgages given by the borrowing shareholders of this series. On June 4, 1888, Mahoney purchased of the association eight shares of Series C, and on November 3, 1890, four shares of Series D. On the first Monday in September, 1888, the association having money in its treasury, under the provisions of its by-laws offered to loan $1,200 thereof to the share-

holder who would pay the highest premium thereon. Mahoney having offered 30½ per cent. premium, became the borrower, and, in accordance with the requirements of the by-laws of the association, executed a bond to the association under the terms of which he agreed to repay the amount so borrowed on or before ten years from date, unless the association should sooner terminate, and then upon such termination, with interest at the rate of 9 per cent. per annum payable monthly on the first day of each and every month thereafter. He also agreed to keep up the monthly dues of one dollar a share upon six of the shares of Series C belonging to him until he had fully repaid the said sum of $1,200, and to assign 'these six shares to the company as security for the repayment of the loan. It was further provided in the bond that the principal sum mentioned therein, with interest, should become immediately due and payable upon default in payment of interest, or if the taxes due on the property or the premium upon not less than $900 of insurance thereon should be due and unpaid for six months, or in case the shares of stock should at any time be sold for the nonpayment of dues or fines, or become forfeited to the association for reason. At the same time, as further security for the repayment of the sum borrowed, Mahoney executed to the association a mortgage upon the real estate in controversy. This instrument contained the same conditions as those in the bond, and further provided that all insurance stipulated for should be effected for the benefit of the association, and that, in case of default in this particular or in the prompt payment of taxes, the association might advance such sum or sums as might be necessary to meet these charges, and that they should, upon foreclosure, be deemed secured by the mortgage, and bear the same rate of interest as the principal sum secured thereby. Subsequently, and on July 3, 1889, a similar transaction took place between Mahoney and the association, by which, upon paying a premium of 21 per cent., Mahoney obtained a loan of $400, and to secure the same assigned to the association the remaining two shares of Series C, and executed his bond, with a second

mortgage, upon the property on the same terms and conditions as those contained in the first mortgage. Again, on May 2, 1892, by a similar transaction, Mahoney secured a third loan of $800 on his four shares of Series D, but at a premium of 20 per cent., and thereupon executed to the association his third bond and mortgage, with terms and conditions identical with those upon which the other loans had been obtained. In case of each loan the premium was paid in advance, the association deducting the amount from the face of the loan; the bond and mortgage being executed to the full amount for which each bid was made. Mahoney made all payments of interest, dues and fines when they were assessed under the by-laws of the association until November 6, 1893, when the plaintiff purchased the mortgaged property from him, assumed the payment of the mortgages, and became substituted to all his rights and liabilities as a borrowing shareholder in the association. After this date, and until May 6, 1896, the plaintiff met all the obligations assumed by him as a shareholder, kept paid up the monthly installments of interest, and observed all the conditions of the several mortgages, but after that date failed and refused to make any other payments of dues or interest, except that on August 1, 1896, he paid the dues for June, July and August on the four shares of Series D, and the interest due for those months upon the loan secured upon these shares, amounting together to the sum of $30. He also failed to keep the property insured, insisting that the payments already made had more than discharged the various loans, and that he was entitled to have the mortgages released. On November 6, 1897, the trustees had the property insured at a cost of $25.60.

Upon these facts the district court found that the association was dissolved, and that the directors had properly assumed control of its affairs as trustees of the shareholders and creditors, and that the plaintiff was not entitled to have a receiver appointed; that the trustees had no authority to collect fines and dues upon the unmatured shares, whether held by a borrower or not, but that their functions and powers were limited to the

doing of such acts only as were necessary to collect and distribute the assets; that the fines and monthly dues paid by the shareholders were not to be regarded as credits upon loans, but belonged to all the shareholders; that the plaintiff was not entitled to a credit for the full amount of the premiums paid upon his loans, but for such part thereof only as had not been earned, this amount to be determined by dividing the whole premium paid by the number of months required to mature the shares upon which the particular loan was made, and multiplying the quotient by the number of months still to elapse before maturity; that the monthly payments of interest were not *ipso facto* credits upon the mortgage indebtedness, but should be so treated, the payment on each loan to be applied to it under the rule of partial payments; and that the unearned premium was to be deducted in each instance from the loan upon which it was paid as of the date at which it was made.

The cause was then submitted to a referee to ascertain the difference between the parties under these findings as follows: (1) to ascertain the amount of unearned premium on each loan, and deduct the same from the amount of the loan at the date at which it was obtained; (2) to compute the interest on the balance at 9 per cent. per annum from the date at which the loan was made; (3) to find the amount paid as interest on each loan, and give plaintiff credit for the same on the principle of partial payments, and thus find the difference; and (4) if there should thus be found any sum still due defendants, then to add to such amount the $25.60 paid by defendants for insurance, with interest at 9 per cent. per annum from November 6, 1897, the date of payment.

The referee found and reported a balance due defendants, including the sum paid for insurance, with interest thereon, of $2,753, and a judgment of foreclosure was entered in their favor directing a sale of the property. Plaintiff has appealed from the judgment and an order denying a new trial.

*Mr. Marcus L. Crouch* and *Mr. Gust Moser,* for Appellant.

*Mr. George B. Wilds* and *Mr. E. E. Hershey,* for Respond-
ents.

MR. CHIEF JUSTICE BRANTLY, after stating the case,
delivered the opinion of the Court.

Many errors are alleged as grounds for a reversal of the ac-
tion of the district court, but of these we shall notice only three.

1.   In the directions given to the referee touching the credits
to be allowed plaintiff in ascertaining the balance due, no ac-
count was taken of the sum of $30 paid as interest and dues
for June, July and August on the four shares of Series D.
This amount, with interest from the date of payment, should
have been allowed as a credit.

2.   Plaintiff insists that he should have been allowed as
credits upon his loans the whole amount of the premiums paid
by him as of the respective dates of payment.   The theory of
his argument is that the consideration or inducement for pay-
ing these large premiums was the mode of payment, being in
small sums monthly, and his participation in profits resulting
from premiums, dues and fines from time to time, and other
sources of income; and that as the association allowed itself
to become dissolved by limitation, this consideration has failed.
He insists, also, that the relation between himself and the asso-
ciation should be declared to be that of debtor and creditor
simply, and that the settlement should be made on that basis,
he being allowed credit for all payments made on the principle
of partial payments.   Taking the contracts as they are stated
in the bonds and mortgages according to their terms, they pro-
vide for a repayment of the sums advanced absolutely at the
end of ten years, or upon the expiration of the charter limit,
without reference to the maturity of the shares.   They contain
no stipulation that upon the maturity of the shares they should
be finally surrendered in full payment of the loans.   Under the
by-laws of the association, however, this stipulation is to be
read into them, and they are to be construed accordingly.   The
shares were bought, and the loans or advancements were made,

with the intention that this should be the result. Indeed, no other claim is made by the trustees. They assume the position, however, that the possible dissolution of the association before maturity of all shares was a matter within the contemplation of the plaintiff as well as of the association, and that, having secured the advancements under such circumstances, it would be inequitable to allow him a credit for the premiums, or any part of them, thus depriving the nonborrowing shareholders of a part of the value of their shares as ascertained at the date of dissolution. They insist also that under the circumstances of this case, other borrowing shareholders having fully matured their stock without taking credit for any portion of the premium paid, the plaintiff should not be allowed a credit for his. We do not think either of these positions correct. The plan adopted by the trustees to mature the shares of the borrowing members was entirely unauthorized. As there were no outside creditors, the only power possessed by them was to collect up the assets, and distribute them *pro rata* among all the share-holders. Apart from the payment made by the plaintiff in August, 1896, which has already been disposed of, we shall, therefore, disregard entirely what has been done by the trustees since May, 1896, and ascertain from the conditions then existing what the rights of the parties are. The weight of authority is, perhaps, in favor of plaintiff's position that he should be credited with the full amount of the premiums paid as of the date of each loan. This coincides with the view stated by Mr. Endlich in section 531 of his work on Building Associations. It is not controverted by plaintiff, however, that the ascertained value of unmatured shares of Series C and D, on May 6, 1896, was correctly stated in the circular of August 22. These values were obtained by apportioning all premiums, interest, dues and fines paid up to that time, and also funds arising from forfeit-ures. The premiums had been paid with full knowledge that the association would be dissolved on that date, without reference to the maturity of the shares. It is not claimed that the holders of these shares would not, under the value thus ascer-

tained, receive all that they had paid into the association, dollar for dollar, and a profit besides. In fact, from the condition of affairs as shown in the record, the shares were worth more than had been paid upon them, with accumulated interest. The association was, therefore, not insolvent. This condition exists only where, in the course of the business, the principal of the shareholders has become so impaired as to fall below the level of the amount paid in. The premium paid by plaintiff, as well as by the other advanced members, entered into and made a part of the value of the shares. This adjustment gives to the unadvanced members somewhat the advantage, and to this extent is inequitable. At the same time, to allow plaintiff credit for the whole of the amounts paid would give him a much greater advantage over them. The question how to dispose of it presents great difficulty, but the plan adopted by the court below, by which he was given credit for the unearned portion, seems, under all the circumstances, to be the most equitable; for it must be remembered that the obligations resting upon the members are mutual, and that all are parties to the contract of advancement or loan. Though, upon the dissolution, the contract was broken down, yet in adjusting the rights of the shareholders as among themselves it should be enforced as near as may be with the view of allowing each to receive nothing more than his associate. The consideration for which the premium was paid has failed in part, but only in part. The statutes in some of the states governing these associations provide that upon voluntary repayment of a loan there must be an equitable apportionment of the premium, and this principle, which produces a fair result, has been recognized and applied to cases where the association has become insolvent, and has had its affairs administered by a court of equity. (*Towle* v. *Am. Bldg. Loan & Inv. Society* (C. C.), 61 Fed. 446.) Though the act authorizing the association in question here contained no provision on this subject, subsequent acts of both the territorial and state legislatures have recognized and provided for its application to voluntary payments. Under the circum-

stances of this case, we think its application just and equitable.

The district court held that the only credits to which the plaintiff was entitled were the interest payments and the unearned portion of the premiums, and that he must pay the balance due upon the bonds and mortgages. No provision was made in the decree allowing him a distributive share in the assets upon final distribution. We think it was its duty to ascertain what the accrued value of the shares of each class was, and to allow plaintiff a credit also for these amounts upon the respective loans, without interest, after deducting from the value of the stock a sufficient amount to pay plaintiff's proportionate share of the reasonable expenses of administration of affairs by the trustees. There can be no just reason assigned, under the circumstances, why the plaintiff should be compelled to pay the full amount of his loan as found by the trial court, and then be presently reimbursed by the trustees. The method of settlement thus indicated not only secures to plaintiff all the rights to which he is entitled, but it also does no wrong to other shareholders. The settlement should, therefore, have been made as follows: Charge the plaintiff with the amounts of the loans, without interest, including the earned portion of the premiums as found by the district court; credit him with the ascertained value of his shares on May 6, 1896, less his share of expenses of administration; then charge interest from that date until the date of judgment upon any balance found due. Plaintiff should also be credited, as hereinbefore indicated, with the amount of the payment made in August, 1896, and in like manner charged with the insurance premium paid by the trustees in November, 1897.

3. Plaintiff contends that a receiver should have been appointed, because the evidence demonstrates that the association was insolvent at the date of its dissolution, and that at the time this suit was brought the trustees were proceeding to continue the business by collecting dues, fines and interest from the borrowing shareholders, instead of limiting themselves to collecting and distributing the assets; thus casting an unequal bur-

den upon the borrowing shareholders. Section 561 of the Civil Code constitutes the directors of a corporation dissolved for any reason trustees for the creditors and shareholders, with full power to wind up its affairs, unless some other person be appointed for that purpose. No exception is made in case of insolvency. The intention of the legislature seems to have been to provide the most inexpensive and expeditious way for the administration of the affairs of a defunct corporation by confiding them to the hands of those who are best acquainted with them, and have a direct personal interest in preserving and appropriating the assets to their legitimate purposes, subject to an accounting or removal by a court of equity at the instance of a shareholder or creditor whose rights are jeopardized or betrayed. (*Havemeyer* v. *Superior Court,* 84 Cal. 327, 24 Pac. 121, 10 L. R. A. 627, 18 Am. St. Rep. 192.) In no case, however, will a court resort to a removal of a statutory receiver, and appoint one in his stead, until it is made to appear that the person complaining has been, or is about to be, injured by an unwarranted procedure on his part. In this case, as we have seen, the association was not insolvent. The principal of the contributing shareholders was not impaired in any way at the time of the dissolution, and it is not claimed that the assets have been mismanaged, or in any way misappropriated by the trustees. True, as has already been stated, their action in attempting to mature the shares of the borrowing shareholders was and is unauthorized; but their course in this particular has not resulted in loss, nor has it in any way injured plaintiff. Indeed, the holders of shares of Series C who paid their interest and dues after the dissolution, thus making a conventional arrangement with the trustees, received all the advantages they would have received if there had been no dissolution. Instead of ascertaining the balance due from himself, and tendering it to the trustees, thus securing his release, or, which would have been better, demanding an accounting of them, and thus speeding them in the administration of their trust, he took advantage of the indulgence extended to him by them,

and, when they refused to release him from his just obligations to the other shareholders, he sought to further delay and confuse matters and incur expense by insisting that they should be declared unworthy of confidence, and a receiver be appointed in their stead. Their acts, though unauthorized, have not injured him. He therefore has no sufficient ground upon which to urge the court to discredit them. The appointment of a receiver was properly refused.

Let the judgment and order be reversed, and the cause be remanded, with directions to proceed in accordance with the views herein expressed.

*Reversed and remanded.*

Mr. Justice Pigott: I concur.

Mr. Justice Milburn: I concur in the judgment of reversal, and with the conclusions and reasoning of the Chief Justice as to all matters except as to the premiums. There seems to be no contention between the parties as to the district court's finding that the plaintiff was entitled to a credit for unearned premiums or "bonus," but as to its correctness I am not sure. If the company had failed to do its part of the contract, or if it had agreed to let the plaintiff pay up before the end of the life of the concern, then we should have a different case from the one at bar; but when the borrower gives a bonus for the use of the money, to be paid back in installments during a term limited, as he contemplates, by the life of the association, I cannot see why, at the end of such life, he should have a special credit upon his mortgage debt for any alleged unearned part of the bonus. In the auction sale of the money to the borrower, he, knowing the term of the company's life, made his bid proportionately large or small. I do not see how he can get any credit for any alleged unearned part, except indirectly, and so far as all the bonus went to swell the value of his stock with all the other stock, the value of the stock going to wipe out his mortgages.